IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Harold L. Mogul, | ) | |
| | ) | C/A No.: 2:04-1197-18 |
| Plaintiff, | ) | |
| | ) | **ORDER and OPINION** |
| vs. | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

      Plaintiff Harold L. Mogul filed this suit pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346 et seq., seeking to recover damages for injuries he claims to have sustained as a result of allegedly negligent medical treatment received at the Veteran's Administration Medical Center ("VA Hospital") in Charleston, South Carolina. The case was tried before the court, sitting without a jury, on April 18-20, 2005. Based upon the evidence presented and the applicable law as set forth below, the court makes the following findings of fact and conclusions of law.

**I.     FINDINGS OF FACT**

      1.      Plaintiff was born on January 5, 1937. He was a patient at the VA Hospital for treatment, including annual physical exams, between 1992 and 2001. Dr. Jan Basile was his primary care physician at the VA Hospital. (April 19, 2005 Tr. at 121.) At all time relevant to this action, Dr. Basile was acting within the scope of his duties as a federal employee.

      2.      Plaintiff requested cancer screening from Dr. Basile upon his initial

visit in 1992 and never changed this request.[1] (April 18, 2005 Tr. at 146, 157; April 19, 2005 Tr. at 25, 145.) Plaintiff was given a PSA Serum Antigen ("PSA") test in 1993 and one in 1995 as ordered by Dr. Basile.[2] The 1993 PSA score was 1.2 and the 1995 PSA score was 1.8. (April 19, 2005 Tr. at 123.)

3.     A PSA score between 0 and 4 is considered normal. A score between 4 to 10 is considered abnormal and could lead to a diagnosis of prostate cancer. Between 10 and 20 the probability of a malignancy goes up. The probability of a malignancy is quite high for scores over 20. (Frame Dep. at 30.)

4.     Prostate cancer results in approximately 30,000 deaths per year in men. It is the second leading cause of cancer deaths for men. (April 19, 2005 Tr. at 45; April 20, 2005 Tr. at 10.)

5.     Dr. Basile performed one digital rectal examination ("DRE") in 1997 and did not order any further PSA tests after 1995 until 2002.[3] Plaintiff's blood was drawn and other blood tests were performed regularly over the period between 1995 and 2001.[4]

---

[1] Dr. Basile cannot recall whether plaintiff requested the PSA test on the first visit. However, Dr. Basile noted that it was not his practice in 1993 to initiate PSA tests. He concedes that the "most reasonable explanation" for ordering a PSA test in 1993 would be because the patient asked for it. (April 19, 2005 Tr. at 119, 138.)

[2] Dr. Basile also ordered a PSA in 1994 but this was not performed for unexplained reasons, although other blood tests were performed in 1994 after the PSA was ordered. (April 19, 2005 Tr. at 138-39.)

[3] A PSA test was ordered in August 2001 but was not scheduled to be performed until February 2002. Plaintiff did not have this test, but in June 2002 was tested by Dr. Papadopoulos.

[4] PSA tests could have been performed during that time since blood was already being drawn.

(April 19, 2005 Tr. at 144, 153-54.)

      6.     The PSA is a simple procedure involving the drawing and testing of blood and is virtually without risk.  It is used as a screening test for prostate cancer for asymptomatic men and can be an indication of prostate cancer if the PSA score is elevated.  DREs can determine different consistencies of the prostrate which could indicate cancer.  These two methods help diagnose prostate cancer at a time that affords an opportunity to treat and cure the disease.  The PSA and DRE tests are the principle methods for prostrate cancer screening and will lead to an early diagnosis of prostate cancer. (April 19, 2005 Tr. at 45; April 20, 2005 Tr. at 13.)

      7.     The goal of early detection is to identify prostate cancer at a time when treatment is most likely to be effective. (April 19, 2005 at 47, 83, 158, 167; April 20, 2005 Tr. at 56.) The medical community is highly successful in curing cancers that are detected at an early stage and remain confined to the prostate. (April 19, 2005 Tr. at 47, 83.)  Studies have shown that long term survival is considerably diminished in men diagnosed with prostate cancer that has spread beyond the confines of the prostate, and tumors which have spread are generally not curable.  (April 19, 2005 Tr. at 167.)

      8.     Dr. Basile did not advise plaintiff of the risk of discontinuance of the PSA testing, the decision to discontinue the PSA tests after 1995, or that PSA or cancer screening tests were not included in plaintiff's regular blood work after 1995.  (April 19, 2005 Tr. at 154-55, 160-61.)  Dr. Basile also did not chart this change nor did he obtain plaintiff's permission for the change from performing tests from 1993-1995 to not performing tests after 1995.  Dr. Basile also does not recall ever discussing PSA testing

with plaintiff. Id.

9.  In June 2002, plaintiff was seen by Dr. Demetrios Papadopoulos, a private physician, who had seen plaintiff on occasion over the years but who was not his primary care physician. In this examination Dr. Papadopoulos performed a DRE and detected an abnormality of the prostate. Dr. Papadopoulos ordered a PSA, which showed that plaintiff's PSA score was 33.7. (April 19, 2005 Tr. at 78.) Dr. Papadopoulos referred plaintiff to Dr. Alan Fogle, a private urologist. After further testing the diagnosis of prostate cancer was confirmed and plaintiff was sent to the Cleveland Clinic for a nerve sparing prostate removal procedure. The cancer had spread beyond the prostate and the procedure did not result in a successful cure. (April 19, 2005 Tr. at 28-31.) Plaintiff then underwent radiation treatment to the pelvic area, which was unsuccessful, and the PSA levels continued to climb. Id. Plaintiff's prostate cancer is aggressive, has now metastasized, is incurable, and will lead to his death. (April 19, 2005 Tr. at 28, 39-42, 72-73; April 20, 2005 Tr. at 56.)

10.  The court finds that DREs and PSA testing between 1995 and 2000 would most probably have led to an earlier diagnosis of the prostate cancer. (April 19, 2005 Tr. at 47, 83-85.) The court also finds that had the cancer been detected at an earlier stage, it most probably would have been curable. (Id., April 20, 2005 Tr. at 72.) Therefore, had the cancer been detected earlier, it is most probable that the cancer would have been cured and plaintiff would have a normal life expectancy.

11.  The standard of care for physicians such as Dr. Basile requires that once a decision is made to perform PSA tests, until the patient informs the physician

of a desire to change his decision (which did not happen in this case) or the physician advises the patient that he will no longer perform PSA testing (which did not happen in this case), the PSA test must continue to be performed and that the failure to do so is a breach of the standard of care. (April 20, 2005 Tr. at 63-66.)

12.    The decision to discontinue PSA testing and the concomitant discontinuance of any further PSA test after 1995 without any request from plaintiff, without advising or discussing with plaintiff the change in treatment, and without charting this change,[5] is a breach of the standard of care. (April 20, 2005 Tr. at 63-66.) The court finds that but for this breach of the standard of care, plaintiff's injuries and the premature death he now faces would not have occurred.

13.    The standard of care also requires physicians who are treating patients to disclose to the patient the nature of treatment and any material risks and benefits to that treatment. (April 20, 2005 Tr. at 65; Frame Dep. at 74.)  This duty includes advising the patient of the risks of not performing PSA tests after the decision to perform the tests has been made. (April 19, 2005 Tr. at 53, 86.)  The risk of not testing includes that the failure to perform these tests could result in an inability to detect prostate cancer early enough for it to be cured, and therefore, the risk of death from prostate cancer if it is detected too late.  This is the very risk which actually materialized and is the proximate cause of the injury to Mr. Mogul in this case.  Testing would most probably have led to detection at an early stage and to eventual cure.  The court finds that a reasonable person in plaintiff's

---

[5] The standard of care also requires that, if a change is to be made in a patient's course of treatment, the change must be charted in the patient's medical record. (April 20, 2005 Tr. at 66.)

5

position would have decided to continue to undergo this testing and would not have allowed discontinuance to occur had Dr. Basile disclosed the risks of discontinuance. (April 19, 2005 Tr. at 44, 52-54, 86-88, 92; April 20, 2005 Tr. at 55-56.) As noted above, plaintiff specifically requested cancer screening from Dr. Basile in 1992 and there is no reason to think that he would have changed this request thereafter. (April 18, 2005 Tr. at 146, 157; April 19, 2005 Tr. at 25, 145.)

14. The decision to discontinue PSA testing and the concomitant discontinuance of any further PSA test after 1995 without discussing the risks and/or benefits of discontinuing the treatment is a breach of the standard of care. (April 19, 2005 Tr. at 24.) The court finds that but for this breach of the standard of care, plaintiff's injuries and the premature death he now faces would not have occurred. The court finds that it was completely foreseeable to defendant that the failure to disclose the risk to plaintiff and the failure to perform DREs and PSA testing between 1995 and 2000 would result in plaintiff's prostate cancer progressing to an incurable state before it was detected, whereas proper disclosure and DREs and PSA testing would have resulted in detection at a time when plaintiff's prostate cancer still could have been cured. (April 19, 2005 Tr. at 50, 54, 84-85.) All the medical experts, including Dr. Basile, agree that the prostate cancer is curable when discovered in its early stages. (April 19, 2005 Tr. at 158.)

15. Defendant has presented insufficient evidence to support the allegations of its answer that plaintiff failed to follow the instructions of his health care provider or that his failure to attend scheduled appointments contributed in any way to the injuries he has sustained. To the contrary, it is virtually uncontested that plaintiff requested cancer

screening and testing and never changed his request. (April 18, 2005 Tr. at 146, 147; April 19, 2005 Tr. at 25, 145.)

16. As a direct result of defendant's failure to exercise the requisite degree of skill and learning possessed and exercised by other physicians in good standing in their field in the same or similar circumstances in connection with the treatment and care of plaintiff, plaintiff's cancer was incurable when it was detected and plaintiff sustained injuries and damages as are discussed below. The specific failures of the defendant are changing the initial 1993-1995 treatment of cancer screening to discontinuance of this treatment after 1995 without plaintiff requesting any change and without Dr. Basile or others involved in plaintiff's health care informing plaintiff that no further cancer screening or PSA tests were going to be performed; and changing plaintiff's cancer screening regiment without advising plaintiff of the risks and/or benefits of such a course of action and without charting these changes in his medical records.

17. In making the above findings of fact, reference has been made to pertinent portions of the record; however, the court has taken into consideration all of the evidence presented. The court specifically finds the credible evidence, after considering the appearance, demeanor and qualifications of the witnesses and the testimony as a whole, supports each of the above findings by a preponderance of the evidence.

## II.     CONCLUSIONS OF LAW

This case is brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346, et seq. Plaintiff timely filed an administrative tort claim, in writing, for more than the amount awarded herein. Defendant failed to make a final disposition of

plaintiff's claim within six months after it was filed and this lawsuit followed. Accordingly, this court has jurisdiction over this matter pursuant to 28 U.S.C. §1346(b). The FTCA provides that the United States shall be liable in the same manner and to the same extent as a private individual would be under the circumstances. 28 U.S.C. § 2674. The substantive law of the state that is the site of the alleged tort governs claims under the FTCA, subject to the limitations set forth in the FTCA. 28 U.S.C. § 1346(b). In the case at bar, all the alleged omissions occurred in South Carolina, so the substantive law of that state applies.

In order to establish negligence and entitlement to recovery in a medical malpractice action in South Carolina, plaintiff must establish 1) evidence of generally recognized practices and procedures which would be exercised by competent practitioners in a physician's field of medicine under the same or similar circumstances, and 2) evidence that the physician departed from the recognized and generally accepted standards, practices, and procedures as alleged by plaintiff. Cox v. Lund, 286 S.C. 410, 414, 334 S.E.2d 116, 118 (1985). Plaintiff must also prove that the departure by the physician most probably resulted in plaintiff's injuries and damages. Jones v. Owens, 318 S.C. 72, 456 S.E.2d 371 (1995).

My factual findings reflect that the standard of care in this case requires a physician such as Dr. Basile who has begun a course of providing PSA testing, as requested by plaintiff, to continue to perform PSA testing until the patient informs the physician of a desire to change his decision to obtain testing or the physician advises the patient he will no longer perform PSA testing. The standard of care also requires a

physician such as Dr. Basile to inform the patient of the risks and/or benefits of any treatment. After initially providing PSA testing from 1993 to 1995, defendant changed the treatment for cancer screening or PSA tests without receiving any request or permission of plaintiff, without informing plaintiff of the change that resulted in no further cancer screening or PSA tests being performed after 1995 (except one DRE), and without advising plaintiff of the risks and/or benefits of such a course of treatment. Additionally, Dr. Basile failed to chart these changes on plaintiff's medical records. As such, defendant departed from the standard of care.

Each of these departures resulted in no further PSA testing of plaintiff after 1995, and only one DRE in 1997, despite the fact that plaintiff had made known his desire for cancer screening or PSA tests and had not requested any change or given permission for a change in treatment. The departure by defendant from the standard of care resulted in no testing (except one DRE) after 1995 when, absent such departure, tests would have continued.

In these circumstances and having found that the failure to perform DRE and PSA tests between 1995-2000 most probably resulted in the failure to diagnose plaintiff's cancer at a time when it was most probably curable, the court concludes that plaintiff has established the elements necessary to recover on a negligence claim against defendant. The departures from the standard of care by defendant were a proximate cause of plaintiff's injuries and damages.[6]

---

[6] In reaching my conclusions I have considered defendant's contention that South Carolina defers to the collective wisdom of the profession when there are different schools of medical thought and alternative methods of acceptable medical treatment

South Carolina law as well as 28 U.S.C. § 2674 allows plaintiff to recover actual damages for losses proximately caused by defendant's wrong. Hadfield v. Gilchrist, 343 S.C. 88, 538 S.E.2d 268 (Ct. App. 2000). Under South Carolina law these losses can include past and future medical expenses and past and future loss of income and earning power. Watson v. Wilkinson Trucking Co., 244 S.C. 217, 136 S.E.2d 286, 291 (1964).

Additionally, plaintiff may recover damages for past and future pain and suffering. "An award for pain and suffering compensates the injured person for the physical discomfort and the emotional response to the sensation of pain caused by the injury itself." Boan v. Blackwell, 343 S.C. 498, 502, 541 S.E.2d 242, 244 (2001).

Plaintiff may also recover for mental anguish. "Separate damages are given for mental anguish where the evidence shows . . . that the injured person suffered shock, fright, emotional upset, and/or humiliation as the result of the defendant's negligence." Id.

Plaintiff's losses may also include loss of enjoyment of life as an element of loss.

> Damages for "loss of enjoyment of life" compensate for the limitations, resulting from the defendant's negligence, on the injured person's ability to participate in and derive pleasure from the normal activities of daily

---

which allow a physician to follow any acceptable alternative without liability. Assuming that South Carolina has adopted a "two school of thought" defense (which plaintiff disputes), this defense, even if it were available to defendant, does not apply to defendant's acts of negligence in changing the course of treatment from providing PSA tests to not doing so without obtaining plaintiff's permission or advising plaintiff of the change and failing to chart the change. This defense also does not apply to defendant's negligence in failing to inform plaintiff of the risk of not having regular DREs and PSA tests performed. There are not two schools of thought as to these acts or omissions. Thus, this defense does not apply to these acts or omissions.

10

> life, or for the individual's inability to pursue his talents, recreational interests, hobbies or vocations. . . . In our view, "loss of enjoyment of life" damages compensate the individual not only for the subjective knowledge that one can no longer enjoy all of life's pursuits, but also for the objective loss of the ability to engage in these activities.

Id.

## III.     DAMAGES

Prior to his prostate cancer plaintiff was in good health and enjoyed an active, normal life in all respects. He was a father and provided for his two young children (twins, age twelve at trial), and his adult semi-disabled daughter. He also enjoyed the company of his brother, sister and two other grown children and was fully engaged in recreational activities including golfing and socializing with friends, in addition to having an active social and work life.

At the time of discovery of the prostate cancer on July 1, 2002, plaintiff was sixty-five year old. (April 18, 2005 Tr. at 104.) According to S.C. Code Ann. § 19-1-150, he is projected to have an additional 16.80 years of life from that time, until approximately April 19, 2019.[7] Plaintiff's urologist estimated plaintiff's remaining life expectancy from the time of trial at five to eight years. (April 19, 2005 Tr. at 42.) For purposes of determining damages, the court finds plaintiff's life expectancy from the time of trial to be seven years.

Plaintiff lists past medical expenses at $69,649.19. (Pl.'s Ex. 6.) According to plaintiff, these expenses were directly related to, and necessary because of, the failure to

---

[7] This projection is a very conservative estimate, given the fact that plaintiff's father died in his late 80s, and plaintiff's mother is still alive at age 89.

11

diagnose plaintiff's cancer at a time when treatment most probably would have resulted in a cure.  However, plaintiff's own urologist testified that plaintiff would have incurred items 1, 2, 5, 8, 9, 10, 11, 12 and 13 even if defendant continued testing and the cancer had not metastasized. (Pl.'s Ex.6; April 19, 2005 Tr. at 35-37.)  As such, only items 3, 4, 6, 7, and 11 (totaling $41,995.54) are causally connected to the defendant's malpractice.  Damages for past medical expenses total $41,995.54.

Plaintiff's economic expert Oliver Wood, Ph.D. estimated the future economic loss due to extra medical expenses that would likely be incurred due to plaintiff's prostate cancer.  In calculating that amount Dr. Wood considered a life care plan prepared by Sharon Reavis.  The need for the future medical expenses was established by plaintiff's urologist.  (April 18, 2005 Tr. at 103-104.)  Dr. Wood discounted the predicted future medical expenses to present value and estimated ten different amounts based on a life expectancy of one to ten years. (Def.'s Ex. 33.)  Defendant challenges the life plan's inclusion of annual CT scans of the pelvis and chest, and bone scans, on the basis that plaintiff has not received such treatment to date on a periodic basis.  The court finds that plaintiff is entitled to comprehensive medical care in his final years.  As such, the contested elements of the life care plan are to be included.  Dr. Wood's chart lists $283,466.20 as the present value of future medical expenses for a life expectancy of seven years.  Therefore, plaintiff is entitled to $283,466.20 for future medical expenses.

Plaintiff claims $416,00.00 in lost future earnings, with a present value of $319,294.00.  Plaintiff bases this amount on his 2004 annual salary ($104,000.00) and the contention that he will be able to work up until four years prior to his death.   However,

12

plaintiff's own economic expert based his report on the assumption that plaintiff would be able to work one to five additional years.[8] (Def.'s Ex. 33.) Therefore, the analysis of plaintiff's own economic expert lists no lost earnings for life expectancies five through ten (since plaintiff would not be working past year five). Assuming a life expectancy of seven years, plaintiff is entitled to no damages for lost earnings.

As a direct result of defendant's breach of the standard of care, plaintiff will require future treatment including approximately two years of chemotherapy with attendant physical pain and suffering. Plaintiff will experience pain, joint fractures, bleeding, anemia, blood transfusions, general deterioration of his body and immune system, with attendant illness, malaise, nausea, weight loss, hair loss, dermatologic and neurologic effects, among other debilitating complications. (April 19, 2005 Tr. at 39-43, 72.) For the pain and suffering prior to and during his two years of chemotherapy, the court finds find that an appropriate award is $750,000.00.

As a direct result of defendant's breach, plaintiff has suffered and continues to suffer severe mental anguish, emotional scarring and psychological damage. As noted, plaintiff's life expectancy is now seven years. It has been three years since his diagnosis. Thus his mental anguish, including psychological trauma and injury, apprehension, nervousness and anxiety, depression, fright and fear, anger, worry, grief and disappointment will continue over a ten year period. The enormity of these injuries are great and bear heavily upon plaintiff, as they would upon anyone in his unfortunate

---

[8] On cross-examination Dr. Wood stated, without objection from plaintiff's counsel, that the source of the five year assumption was plaintiff's statement that he was going to work until age 72. (April 18, 2005 Tr. at 113.)

13

circumstance.

Plaintiff has become withdrawn, lethargic and lost his vitality. He is concerned over the imminent risk of death at any time. He faces certain medical problems and treatment which will include chemotherapy. He has a great deal of apprehension, anxiety and worry over the future of his dependant children. (April 18, 2005 Tr. at 156-57.) His inability to be fully engaged with his young children as he was in the past has an emotional impact on plaintiff, causing him to seek the services of a psychiatrist. (April 19, 2005 Tr. at 8, 36-37.)

Additionally, plaintiff faces a premature death from prostate cancer which will include significant chemotherapy and a myriad of complicated and painful procedures. His death will be gradual, agonizing and a most difficult one and he is aware of this future at all times and has to live with this knowledge every hour of every day.

Based upon the credible testimony of plaintiff and his doctors and family, the court is convinced that the impact of having incurable cancer, especially knowing that it was preventable, has taken and will take a heavy toll on plaintiff.[9] Further, the emotional damage flowing from the injury parallels the considerable physical pain and suffering. Thus, the court finds that plaintiff is entitled to $3,500,000.00 for the ten years of mental anguish, emotional scarring and psychological damage.

As a separate element of damage plaintiff has a loss of enjoyment of life, including sexual dysfunction and a loss of life expectancy, as a direct result of

---

[9] One of plaintiff's children left a well paying job in Colorado and moved his entire family to Charleston to be with his father because he was afraid of what might happen to his father without his family's support.

defendant's negligence. Although remarried, he is unable to engage in sexual activity because of the cancer therapy he is undergoing. (April 19, 2005 Tr. at 10.) Plaintiff underwent surgery for a penile implant, which was ultimately rendered ineffective by the side effects of other medication. Plaintiff previously was active with his family, engaged in recreational activity and enjoyed golfing and other social activity. He now is withdrawn from his minor children and grandchildren, from social activity, and from life's enjoyment in general. Furthermore, plaintiff's life expectancy is now approximately seven years less than normal and ten to fifteen years less than that of his parents. The court finds $1,500,000.00 an appropriate award for loss of enjoyment of life.

## IV.     CONCLUSION

This case turns on a fundamental aspect of medical care: informed consent. Had defendant not changed plaintiff's treatment without his knowledge or consent, the cancer most probably would have been detected at a curable stage. Deprived of a choice, plaintiff now has no chance.

For the reasons stated above, it is therefore **ORDERED** that plaintiff is entitled to an award as follows:

| | | |
|---|---|---|
| a. | Past medical expenses | $41,995.54 |
| b. | Future medical expenses | $283,466.20 |
| c. | Lost future earnings | $0 |
| d. | Pain and suffering | $750,000.00 |
| e. | Mental anguish | $3,500,000.00 |

| | | |
|---|---|---|
| f. | Loss of enjoyment of life | $1,500,000.00 |
| | **TOTAL DAMAGES** | $6,075,461.74 |

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 5, 2005**
**Charleston, South Carolina**